UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　Plaintiff,<br><br>　　v.<br><br>GEORGE JIRI STRNAD II, individually and also d/b/a Abstract United, PayStubDirect.com, PaycheckStubOnline.com, and iVerifyme.com,<br><br>　　Defendant. | Civ. No.: |

**PLAINTIFF FEDERAL TRADE COMMISSION'S
COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.　The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with Defendant's marketing and sale of fake pay stubs, fake bank statements, fake tax forms, and a fake employment verification service.

**JURISDICTION AND VENUE**

2.　This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

1

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b) and 56(a)(2)(A).

## DEFENDANT

6. Defendant George Jiri Strnad II ("Strnad"), also d/b/a as Abstract United, PayStubDirect.com ("Pay Stub Direct Website" or "PSD Website"), PaycheckStubOnline.com ("Paycheck Stub Online Website" or "PSO Website"), and iVerifyMe.com ("iVerifyMe Website") (collectively, the "Websites"), is the owner and operator of the Websites. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Until approximately March 2017, Defendant Strnad resided in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**COMMERCE**

7.      At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANT'S BUSINESS ACTIVITIES**

8.      Since at least 2014 through at least March 2018, Defendant has operated the Websites.  Through the Pay Stub Direct Website and the Paycheck Stub Online Website, Defendant sold customers a variety of financial documents, including pay stubs, tax forms (W-2 and 1099 forms), and bank statements, and he announced plans to sell electric bills later this year.  Exhs. A-G.  Through the iVerifyMe Website, Defendant sold a job verification service in which he would "verify" any employment and income the customer requests.  Exh. H.  Defendant advertised these documents and services to be fake, but made clear in his ads that they appeared authentic.  Defendant knew or should have known that these fake documents and services would be presented as genuine when provided to recipients (such as lenders and landlords).

9.      Pay stubs, also called paycheck stubs or check stubs, can be used to prove identity, residency, income, and/or employment to government agencies, landlords, and lenders.  They typically identify the employer and employee by name and address, and state the employee's full or partial Social Security number, gross and net wages earned, hours worked, pay rate or salary, pay period dates, and deductions.  Bank statements, which show incoming and outgoing payments to and from a bank account, can be used to prove identity, residency, and/or financial assets to government agencies, landlords, and lenders.  Tax forms W-2 and

1099 can be used to prove identity, residency, income, and/or taxes paid to government agencies, landlords, and lenders.   Electric bills can be used to prove identity and residency to government agencies and landlords.   A verification service can be used to provide false references to landlords, lenders, and other companies that receive pay stubs or tax forms as proof of employment and who check their accuracy by calling the listed employer.

10. Customers of the Pay Stub Direct Website could purchase a single fake pay stub in one of several styles for $7, three fake pay stubs for $19, and unlimited fake paystubs for $30.  Exh. I-1.   For example, purchasers of the "striped" pay stub style received a blue-and-white striped pay stub that appeared to be from payroll company ADP.   Exh. J.   Customers of the Paycheck Stub Online Website could purchase one pay stub or tax form (either form W-2 or 1099) for $7.95, three for $14.95, or unlimited for $29.90.   Exh. B-1.   Customers could populate the pay stubs and tax forms with any identification, employment, income, and tax information they chose.   The Websites auto-calculated taxes and withholdings appropriate to generating an authentic-looking pay stub or tax form, or customers could input their own numbers.   Exhs. K; L.

11. The Pay Stub Direct Website has prominently advertised its pay stubs as "fake." For example, through May 2017, the Website's home page used the URL, https://paystubdirect.com/make-fake-pay-stubs.   Exh. M-1.   The home page prominently displayed two bold-faced headings:   "**Make Fake Pay stubs**" and "**Fake Paystubs**."   *Id*.   The current version of the PSD Website includes an FAQ:   "What if I get caught with a fake paystub?"   Exh. N.   In the answer to the FAQ, Defendant disavows knowledge of fake pay stubs:   "Caught with what? … We are assuming you performed a job, in which you were paid

by the customer in cash, and you don't have an expensive and complex software that creates pay stubs." *Id.*

12. At the same time that Defendant has advertised "fake" documents, he has also claimed that his products *look* genuine—a point of emphasis unlikely to appeal to a legitimate company searching for a real payroll product. For example, the Pay Stub Direct Website's home page has advertised "REAL PAY STUB[s]" that satisfy "a record keeping [sic] need for a real, accurate and authentic paystub" (Exh. M-1) and cited specific design details that make Defendant's paystubs the "Most Authentic on the Internet," including "real" check paper and a security seal (*id*. at M-3). The PSD Website's home page explained the significance of an "Authentic looking Paystub": "If it doesn't look authentic at first glance, then people will scrutinize more." Exh. O-5. "Accurate" calculations on fake pay stubs are important, the PSD Website claims, because "[s]crutinous [sic] observers will try to find errors in the math, especially in Consecutive paystubs." *Id*. at O-6. According to the PSD Website's "Styles" page, Defendant "know[s] authentic [sic] and perfection in this product [pay stubs] is the ultimate key." Exh. A.

13. In addition to making these broad claims of its pay stubs' apparent authenticity, the Pay Stub Direct Website offered granular advice on how to make an authentic-looking paystub. For example, in a PSD Website blog post, Defendant explained that "80% of paystubs have a paystub logo," which "show[s] the validity of the Company, and authenticity" and can "make your stubs look more professional." Exh. P-1. Defendant continued: "We have upgraded our site to be able to add a logo to your paystub. This new feature allows your authentic paystub to be even more customized and perfect." *Id.*

5

14. On the Paycheck Stub Online Website, Defendant similarly advertised his pay stubs' apparent authenticity, explaining in a blog post on "Making a detailed pay stub:" "**Authentic pay stubs** are key for your goals. There is no point in saving money creating or buying one, if it is not authentic . . . . It must be detailed, and accurate and authentic for it to be useful, or, it's not useful what so ever [sic]."  Exh. Q-11, -12 (emphasis in original).   In addition, on the PSO Website's "Consecutive Pay Stubs" page, Defendant gave advice on how to make convincing consecutive pay stubs (including prior pay stubs) with "NO MORE WATERMARKS."   Exh. R (emphasis in original).   This advice on consecutive paystubs would not be useful to a legitimate company printing paystubs reflecting current employee pay, but it is highly useful information for bad actors seeking to use fake pay stubs to deceive lenders about consistent income and employment.

15. On both the PSD and PSO Websites, Defendant expressly claimed that his fake pay stubs could be used as income and employment verification documents to obtain a loan. For example, on the PSD Website's Pricing page, Defendant posed the question:   "Paystubs as Verification of Employemt [sic]?"   Exh. I.   Defendant then provided the following answer: "We know you work hard, getting proof that you work shouldn't be hard."   *Id.*   On the PSD Website's "Make a Paystub" page, Defendant explained that "a paystub is proof of income, or income verification, used to attain funds or access to a loan.   This is of prime importance, and there fore [sic] must be accurate and authentic.   This is what   we provide to you."   Exh. K. On the PSD Website's Pricing page, Defendant advertised a three pay stub bundle by stating: "Usually people need past 3 pay stubs," or 4 pay stubs, references to lenders' typical requirements for proof of income necessary to obtain a loan.   Exh. I-1.   In a version of the PSD

Website available through May 2017, Defendant assured customers that he is "NOT PAYSTUB POLICE," and that the websites "have no way to trace or track your numbers."  Exh. M-2 (emphasis in original).  On the PSO Website's "How to get Proof of Income" page, Defendant similarly advised customers to supply "the banking world, the financial world" with "proof of income" in the form of a PSO Website fake document rather than "being busy being an accountant, when you should be making money."  Exh. S.

16.     Defendant cited instances in which customers have used Defendant's products to misrepresent their income source in order to obtain a loan or housing.  For example, in the PSD Website "Pricing" page's explanation of why four consecutive pay stubs are important, Defendant reported:  "We had a dancer who needed to buy a car. . . . She had the money, wanted to Establish [sic] credit, but, always got paid in tips.  So, her financial adviser told her that she needed a loan of some sort. . . . The loan established her as a good borrower."  Exh. I-1.

17.     On the Pay Stub Direct Website, Defendant has listed uses for his pay stubs:  to replace the lost original of documents, to double-check the accuracy of original documents, to prove self-employment, for novelty, for privacy ("You don't want everyone knowing where you work."  "We hhave [sic] had adult entertainer [sic]"), for educational purposes, for "dreams," for movie props, as a gag, and to lie to parents.  Exh. M-2.  Defendant has identified similar uses on the Paycheck Stub Online Website:  to replace lost originals, to simulate originals no longer available from a bankrupt company, to hide money from greedy friends, for movies and education, to double-check the accuracy of original documents, to impress a girlfriend, to deceive parents, for privacy, and for dreams.  Exh. Q-6, -7.

7

18.     Defendant also operates a website that purported to provide a service to "verify" the employment and income information customers enter on his fake pay stubs.  Specifically, both the Paycheck Stub Online Website and the Pay Stub Direct Website directed customers looking for a job verification service to a sister site, www.iVerifyMe.com (Exhs. Q-9, Q-27; T), which promised to "verify" any employment or income information the customer supplies (Exh. H).  The iVerifyMe Website itself claimed to provide a legitimate service for small businesses with overburdened human resources departments for $2.99 to $9.99 per month, depending on the number of employees.  Exhs. H; U-1.

19.     The Paycheck Stub Online Website revealed, however, that the iVerifyMe Website was a vehicle for providing prospective employers, landlords, lenders, and others with whatever information the customer requested—and for whatever purpose.  For example, the Paycheck Stub Online Website's home page explained:   "Our Paystubs show that you had income, but, it's the past.  Sometimes, lenders need Proof of Employment as well, or in lieu of paystubs.  So, we've made it easier for you . . . ."  Exh. L-1.  Specifically, once the customer purchased a "reference number" from the PSO Website, Defendant's "partner" would "confirm to anyone who asks" the customer's "hire date, you are in good standing, and your hourly wage if you so wish."  *Id.*   The "Proof of Income" page noted: "of course this is not intended for fraud."  Exh. V.  The PSO Website's blog revealed that Defendant's job verification partner is or has been Defendant's iVerifyMe Website.  Specifically, the post explained:

> [I]n a job interview, or financial transaction, we need to verify and confirm that what the person is saying is true.  That is why we provide Job Verification Services to our clients.  As of course the entity that will be lending money, or giving access to a home, or anything of value, will want to confirm you will have the means to pay.  Not to mention, have a job.  We trust, and confirm, and we allow you to do this via our Job Verification Services.

Exh. Q-9.  It then linked directly to the iVerifyMe Website.  *Id.*; *see also id.* at Q-27 ("we now have a company [iVerifyMe] that will provide an 800 number service to back you up" with lenders).

20. Defendant also sold fake bank statements, which he described as useful in obtaining a loan.  Exhs. E; F.  For example, on the Paycheck Stub Online Website's home page, Defendant explained:  "Sometimes companies go as far as asking you for bank statements.  We can help you with those also."  Exh. L-1.  On the PSO Website's "Bank Statement" product page and home page, Defendant instructed purchasers to upload a real bank logo (an image of the Chase Bank trademark was the website's example) and enter bank account routing and account numbers, detailed transaction information, and whatever other identification and financial information they chose.  Exh. F; L.  On the Pay Stub Direct Website, Defendant used a placeholder page to identify the "future site" for purchasing "highly authentic Bank statement[s]."  Exh. E.  In the meantime, the placeholder page directed customers interested in immediately purchasing bank statements to "our partners" at the Paycheck Stub Online Website.  *Id.*

21. On the Pay Stub Direct Website, Defendant had announced plans to sell fake electric bills later this year.  The webpage displayed an electric bill with a button for uploading a real electric company logo and stated:  "Working on to have [sic] the ability to make an Electric Utility Bill, in 2017 . . . ." Exh. G.

22. The Terms and Conditions for the Paycheck Stub Online Website stated that all products are "strictly for novelty purposes only."  Exh. W-1.

23. Despite claiming that the financial documents sold on the Websites were for novelty purposes, Defendant did not clearly and prominently mark these documents as being appropriate only for such purposes and did not otherwise clearly and prominently convey to the ultimate recipients that they were fake. For example, Defendant did not include a watermark or permanent label indicating that his documents were fake or were generated by Defendant.

24. Fake identification, residency, financial, tax, and employment-related documents, as well as fake employment verification services, are used to commit identity theft, tax fraud, and loan fraud. For example, identity thieves use fake pay stubs (as proof of income and employment) and fake utility bills (as proof of residency), along with a fake or fraudulently obtained government-issued identifier, to apply for credit cards using identity theft victims' information. When the identity thief fails to pay credit card bills, it is the victim's credit that suffers. Bad actors also use fake pay stubs and fake bank statements to misrepresent income, employment, and assets in order to obtain mortgages, auto loans, and housing leases fraudulently. When bad actors default on loans or leases, the lender and any downstream investors suffer a loss, which is often passed onto consumers with higher lending costs.

25. The instances of identity theft and fraud described in Paragraph 24 are most likely to succeed where the bad actor uses a fake employment verification service to confirm the fake employment, residency, and income information on the bad actor's fake documents.

## VIOLATIONS OF THE FTC ACT

26. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

27.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**Count I**

28.     In numerous instances, through at least March 2018, Defendant has advertised and sold fake pay stubs, fake income tax documents, fake bank statements, and fake employment verification services.

29.     Fake financial documents, such as those sold on Defendant's websites, are used to facilitate fraudulent activity, including identity theft and loan fraud.

30.     Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

31.     Therefore, Defendant's practices as described in Paragraph 28 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

**CONSUMER INJURY**

32.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act.  In addition, Defendant has been unjustly enriched as a result of the unlawful acts or practices.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## **THIS COURT'S POWER TO GRANT RELIEF**

33.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.   The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.


Respectfully submitted,

ALDEN F. ABBOTT
 General Counsel

Dated: 9/12/18

*Katherine White*

Katherine White, Attorney-in-charge
Virginia Bar Number 68779
S.D. Texas (seeking admission *pro hac vice*)
Email: kwhite@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave. N.W.
Washington, DC 20580
(202) 326-2878 (Ms. White)
(202) 326-3062 (Facsimile)

Elisa Jillson, Attorney
DC Bar Number 989763
S.D. Texas (seeking admission *pro hac vice*)
Email: ejillson@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave N.W.
Washington, DC 20580
(202) 326-3001 (Ms. Jillson)
(202) 326-3062 (Facsimile)

and

James E. Elliott, Attorney
Texas Bar Number 06557100
S.D. Texas #14
Email: jelliott@ftc.gov
Federal Trade Commission
Southwest Region
1999 Bryan Street, Suite 2150
Dallas, TX 75201
(214) 979-9373 (Mr. Elliott)
(214) 953-3079 (Facsimile)


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

13